## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
VINEYARD VINES, LLC           :    Civil No. 3:14CV01096(SALM)
                              :
v.                            :
                              :
MACBETH COLLECTION, L.L.C.,   :    December 5, 2018
et al.                        :
                              :
------------------------------x
```

### RULING RE: MOTION FOR ADDITIONAL RELIEF [Doc. #113]

Plaintiff Vineyard Vines, LLC ("plaintiff") has filed a motion seeking additional relief. Plaintiff asserts that defendants MacBeth Collection, L.L.C., MacBeth Collection By Margaret Josephs, LLC, MacBeth Designs LLC, and Margaret Josephs (collectively, "defendants"), violated the Permanent Injunction and Final Judgment on Consent (Doc. #70) entered in this case. See Doc. #113. For the reasons set forth herein, the Court **GRANTS, in part, and DENIES, in part,** plaintiff's Motion for Additional Relief [**Doc. #113**].

## I.   BACKGROUND

On July 30, 2014, plaintiff commenced this action against defendants alleging that defendants were creating and distributing products that infringed plaintiff's intellectual property rights. See Docs. #1; #11. The parties eventually reached an agreement to resolve the action, the full terms and conditions of which were set forth in a settlement agreement

dated June 15, 2015. See Doc. #95. Pursuant to the settlement agreement, the parties executed and filed with the Court a proposed permanent injunction and final judgment on consent. See Doc. #67.

On June 17, 2015, the Court entered a Permanent Injunction and Final Judgment on Consent ("Final Judgment"). See Doc. #70. The Final Judgment required defendants to pay plaintiff $300,000 ("Judgment Amount"), as damages stemming from defendants' infringement of plaintiff's intellectual property rights. See Doc. #70 at 4. The Judgment Amount was to be paid in five installments according to a schedule set forth in the Final Judgment ("Payment Schedule"). See id. at 5. Specifically, defendants were required to pay $75,000 by August 15, 2015, $75,000 by November 15, 2015, $50,000 by February 15, 2016, $50,000 by May 15, 2016, and $50,000 by August 15, 2016. See id.

The Final Judgment imposed a permanent injunction (the "Permanent Injunction"). See id. at 2-4. The Final Judgment also provided that

> in the event Defendants violate this Injunction, breach the Settlement Agreement, or fail to timely pay an installment payment, [plaintiff] shall be entitled to: (a) liquidated damages in the amount of Five Hundred Thousand Dollars ($500,000); and (b) recovery of its actual expenses, including reasonable attorneys' fees, associated with the enforcement of the Settlement Agreement and this Injunction[.]

Id. at 6.

Defendants paid the first installment of $75,000, as required by the Final Judgment, on August 15, 2015. See Docs. #113-3 at 2; #120-1 at 6. However, defendants failed to pay the second installment due on November 15, 2015. See id. On November 15, 2015, defendants filed a motion to seal, indicating that they expected to file a Motion to Modify Consent Judgment, and asking the Court to seal any such motion. See Doc. #72. The motion to seal asserted that the motion and exhibits were "being filed contemporaneously" with the motion to seal, but they were not in fact filed. Id. at 1. The Court conducted a telephonic conference with the parties regarding the motion, and then entered an order directing "the parties to meet and confer in good faith to resolve their disputes before filing any motions to enforce or modify the settlement agreement." Doc. #74.

The parties never filed a motion to modify the settlement agreement, but they apparently agreed to modify the Payment Schedule on their own. See Docs. #113-3 at 2; #120-1 at 6. Plaintiff "informally agreed" to modify the payment schedule in exchange for an additional payment of $20,000 from defendants (the "Additional Debt"). Doc. #113-3 at 2. Defendants paid an additional $115,000 pursuant to the voluntarily modified payment terms.[1] See id. On November 1, 2016, defendant MacBeth Designs

---

[1] Defendants contend that they paid an additional $5,000 they incurred under the modified payment terms on February 29, 2016.

LLC filed a petition for Chapter 11 relief under the United States Bankruptcy Code. See Doc. #120-1 at 7. Defendants missed the next payment due under the modified schedule on November 15, 2016. See Docs. #113-3 at 2; #120-1 at 6-8. $110,000 of the Judgment Amount and the $20,000 in "Additional Debt" remained unpaid. See id.

On December 30, 2016, plaintiff filed a motion seeking an order enforcing the Final Judgment, based on defendants' alleged failure to abide by the payment schedule in the Final Judgment. See Doc. #77. On February 3, 2017, defendants filed a response to plaintiff's motion, asserting that it was impossible for defendants to comply with the payment schedule. See Doc. #85 at 2. Plaintiff filed a reply on February 14, 2017. See Doc. #87.

The Court held an in-person status conference regarding plaintiff's motion for an order enforcing the Final Judgment on February 16, 2017. See Doc. #91. During the conference, the Court noted that an award of some attorneys' fees would be appropriate upon resolution of the dispute and "reminded

---

See Doc. #120-1 at 6. Plaintiff does not address this assertion. See Docs. #113-3 at 2; #113 at 1-2. Therefore, the $5,000 does not appear to be in dispute. The Court notes that, as will be discussed further, any informal agreement to make additional payments is beyond the scope of the jurisdiction retained by this Court to enforce the Final Judgment. See Barcia v. Sitkin, 367 F.3d 87, 106 (2d Cir. 2004) ("[A] district court may not impose obligations on a party that are not unambiguously mandated by the decree itself[.]") (quotation marks and citation omitted)).

defendant Margaret Josephs that she remains personally liable for the outstanding judgment, notwithstanding any bankruptcy proceedings for corporate defendants." Id. at 2. The Court also ordered Ms. Josephs to "make a diligent and concerted effort to stop third party vendors from importing, exporting, shipping, delivering, holding for sale, offering for sale, selling, distributing, returning, transferring and/or otherwise moving or disposing of in any manner any infringing products." Id. The Court held a follow-up telephonic status conference on March 22, 2017. See Doc. #106. The Court then issued an order instructing plaintiff to file a formal motion if it "seeks additional relief from the Court[.]" Doc. #105 at 2.

On June 30, 2017, plaintiff filed the motion for additional relief currently before the Court. See Doc. #113. In light of plaintiff's filing of the motion for additional relief, the Court denied as moot plaintiff's motion seeking an order enforcing the Final Judgment (Doc. #77). See Doc. #114.[2] Plaintiff asserts that it is entitled to additional relief based on defendants' alleged violation of both the Payment Schedule and the Permanent Injunction in the Final Judgment. See Docs.

---

[2] Plaintiff expressly incorporates its prior motion, as well as the responsive pleadings, docketed at Doc. #85 and Doc. #87, into its instant motion. See Doc. #113-2 at 4. All of the relief sought in the prior motion is also sought in the instant motion, so no separate consideration of the original motion is required in this ruling.

#113; #113-2. Plaintiff asks the Court to enter a judgment against defendants MacBeth Collection, L.L.C., MacBeth Collection By Margaret Josephs, LLC, and Margaret Josephs, jointly and severally,[3] awarding plaintiff the unpaid $110,000 of the Judgment Amount, $20,000 in Additional Debt, $500,000 in liquidated damages, $8,600,000 in statutory damages, and $201,657.21 in expenses and attorneys' fees it asserts were incurred enforcing the Final Judgment. See Doc. #113 at 1. Plaintiff also moves the Court for:

> an Order directing Defendants to immediately cease and desist from any and all further violations of the Permanent Injunction and Final Judgment on Consent (DKT. 70), to immediately recall, remove and ready for destruction any and all of Defendants' illegal and illicit Infringing Products from the marketplace, in transit or in inventory, as well as any and all related marketing and advertising materials or references present in any media, electronic media or otherwise.

Id. at 2. Finally, plaintiff moves the Court for "an Order imposing coercive sanctions on Defendants[,]" see Doc. #113 at 2, and asks the Court to hold defendants in civil contempt, see Doc. #113-2 at 7.

Defendants filed a response on August 9, 2017, arguing that plaintiff's claims pertaining to alleged violations of the Permanent Injunction are barred by the doctrine of laches; that

---

[3] Plaintiff does not seek relief against defendant MacBeth Designs LLC because it is in bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey. See Doc. #113-2 at 2 n.1.

defendants have complied with the Permanent Injunction; and that the liquidated damages provision included in the Final Judgment is punitive and, as a result, unenforceable. See Doc. #120. Plaintiff filed a reply on September 6, 2017. See Doc. #123. Defendants filed a supplemental response on September 28, 2017, see Doc. #129, and plaintiff filed a sur-reply on October 19, 2017, see Doc. #132.

## II.  DISCUSSION

### A.   Defendants' Laches Defense

The Court turns first to defendants' affirmative defense of laches. Defendants argue that "the entirety of the plaintiff's trademark and related claims are barred by the doctrine of laches." Doc. #120 at 13. Defendants assert that plaintiff knew or should have known about any alleged violation of the Permanent Injunction long before filing the motion at issue here, but that plaintiff did not complain of an alleged violation at any point in 2016. See id. at 14. Defendants claim they were prejudiced by plaintiff's delay, because they would have taken steps to "have the third-party cease and desist." Id. at 15. Plaintiff contends that defendants are barred from asserting laches because they intended to infringe plaintiff's intellectual property rights. See Doc. #123 at 6. Plaintiff further argues that even if the defendants can assert laches, the defense fails. See id. at 6-7. Plaintiff claims it did not

delay in taking action, because it consistently put defendants on notice that infringing products were in the marketplace, and because the majority of the products at issue are new to the marketplace. See id. Plaintiff further contends that defendants did not suffer prejudice, because defendants "neither report suffering economic prejudice or provide evidence of a change in economic position during the purported period of delay." Id. at 7.

Actions to enforce consent judgments can be subject to a defense of laches. See Brennan v. Nassau Cty., 352 F.3d 60, 63 (2d Cir. 2003). Laches

> is an equitable defense that bars a plaintiff's
> equitable claim where he is guilty of unreasonable and
> inexcusable delay that has resulted in prejudice to the
> defendant. A party asserting the defense of laches must
> establish that: (1) the plaintiff knew of the
> defendant's misconduct; (2) the plaintiff inexcusably
> delayed in taking action; and (3) the defendant was
> prejudiced by the delay.

Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998) (quotation marks and citations omitted).

Here, plaintiff believed that defendants were in violation of the Permanent Injunction before seeking court intervention. Plaintiff did not, however, inexcusably delay taking action. Plaintiff, through its counsel, sent three emails to defendants informing them of alleged violations. On November 20, 2015, Attorney Todd Sharinn, counsel for plaintiff, emailed Attorney

Tim Frawley, counsel for defendants, demanding that defendants "cease[] and desist[] from their continued material breach of the ... Order" and attaching screen shots of allegedly infringing products being sold on third-party websites. Doc. #113-10 at 1-7. On December 4, 2015, Attorney Sharinn again emailed Attorney Frawley, stating that "several of the entities that originally offered for sale and sold the subject counterfeit goods are again selling the same" and that plaintiff "discovered new entities who are also selling these illegal goods." Doc. #113-9 at 26. On November 10, 2016, Attorney Sharinn emailed Attorney David Edelberg,[4] attaching "examples of infringing goods still offered by the MacBeth entities." Id. at 32-35. These communications were sufficient to put defendants on notice of plaintiff's objections to the allegedly infringing activity. See VOX Amplification Ltd. v. Meussdorffer, 50 F. Supp. 3d 355, 364-65 (E.D.N.Y. 2014) (finding allegedly infringing party's receipt of cease and desist letters defeated its defense of laches) (collecting cases). Plaintiff's counsel also raised concerns regarding potential violations of the Permanent Injunction during a status conference with the Court and counsel for defendants on November 19, 2015. See Doc. #76 at

---

[4] Attorney Edelberg is defendant MacBeth Designs LLC's bankruptcy counsel. See Doc. #113-20 at 22.

11. Plaintiff first filed a formal motion seeking to enforce the Permanent Injunction on December 30, 2016. See Doc. #77.

Thus, only seven weeks elapsed between the last email contact regarding violations of the Permanent Injunction asserted by plaintiff, and the filing of the formal motion to enforce. Although there was a delay of approximately 11 months between the December 4, 2015, email and the November 10, 2016, email, defendants offer no argument as to why that particular delay was unreasonable. "[L]aches is an equitable, hence flexible, doctrine, and no length of time is considered per se unreasonable." Whitfield v. Anheuser-Busch, Inc., 820 F.2d 243, 245 (8th Cir. 1987). Here, plaintiff and defendants engaged in substantial discussions regarding potential infringing conduct in late 2015, and defendants undertook to address plaintiff's concerns. It was not unreasonable for plaintiff to allow some months to pass, to permit the measures taken by plaintiff to have an effect. Indeed, defendants submit an affidavit indicating that as a result of their actions in 2015, at one point, "there was no indication that any" infringing products remained available in the marketplace. Doc. #120-1 at 5.

Furthermore, defendants make only a conclusory assertion that the delay in filing a formal motion has prejudiced them. "To prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's

unreasonable delay in bringing the action." Mashantucket Pequot Tribe v. Redican, 403 F. Supp. 2d 184, 198 (D. Conn. 2005). Here, defendants have not shown that they actually changed their position in any way as a result of any purported delay. To the contrary, they contend that they were actively attempting to prevent third parties from distributing infringing products throughout the relevant time period. See Docs. #120-1 at 4 ("On December 21, 2015 MacBeth again contacted Albert Shammah of SSS Design to cease and desist with any marketing concerning the whale."); #120 at 16 ("MacBeth continually contacted any and all vendors that were using the whale image when it became so aware.").

Accordingly, defendants have failed to meet their burden of establishing a defense of laches, and plaintiff's claims are not barred by that doctrine. The Court will thus proceed to consider the merits of plaintiff's motion.

**B.    Failure to Pay Judgment/Settlement Amount**

Plaintiff asks the Court to award it $110,000, which it asserts is the outstanding portion of the Judgment Amount owed by defendants. Defendants do not dispute that they have failed to pay the full $300,000 Judgment Amount, and the parties agree that $110,000 of the Judgment Amount remains unpaid. See Docs. #129 at 6; #120 at 7; #113-3 at 2. Accordingly, plaintiff's

request for an award of $110,000, representing the unpaid portion of the Judgment Amount is **GRANTED**.

### C.    "Additional Debt"

Plaintiff asks the Court to award it $20,000 in "Additional Debt" it asserts is owed by defendants. <u>See</u> Doc. #113 at 1. The parties do not dispute that plaintiff agreed to modify the Payment Schedule in exchange for an additional payment by defendants, and that $20,000 of Additional Debt remains unpaid. <u>See</u> Docs. #113-3 at 2; #120-1 at 6. However, neither party offers any discussion of whether it is appropriate for the Court to enforce this alleged informal agreement to modify the Final Judgment.

On November 19, 2015, the Court issued an Order indicating that any motion to modify the terms of the Final Judgment should be filed on the public docket, <u>see</u> Doc. #74, but the parties never filed such a motion. Thus, any informal agreement between the parties to modify the terms of the judgment is beyond the scope of the jurisdiction retained by this Court to enforce the Final Judgment.

The Second Circuit has addressed the proper manner in which a trial court may interpret and enforce a judgment entered on consent:

> In interpreting a consent decree, we have recognized that courts must abide by the express terms of a consent decree and may not impose supplementary obligations on

> the parties even to fulfill the purposes of the decree
> more effectively. A court may not replace the terms of
> a consent decree with its own, no matter how much of an
> improvement it would make in effectuating the decree's
> goals. Consistent with this narrow construction, we have
> held that a district court may not impose obligations on
> a party that are not unambiguously mandated by the decree
> itself.

Barcia, 367 F.3d at 106 (internal citations and quotation marks omitted). The Court cannot, here, add to the Final Judgment a requirement that defendants pay an additional $20,000 not contemplated by that Judgment.

Furthermore, the Settlement Agreement entered into by the parties includes an explicit merger clause, stating that the Agreement "may not be altered, amended or modified, except in a writing signed by all Parties." Doc. #95 at 18. No such writing has been produced. And, again, even if the parties voluntarily agreed to alter the Settlement Agreement, they did not seek any modification to the Judgment. Accordingly, plaintiff's request that the Court award it $20,000 in Additional Debt is **DENIED.**

D.    **Violation of the Permanent Injunction**

Plaintiff contends that defendants have violated the Permanent Injunction. While plaintiff's argument as to exactly how defendants have violated the Permanent Injunction is less than clear, the Court identifies two theories under which such violation could be found, based on the record before the Court.

First, plaintiff points to numerous instances in which products bearing marks that would violate the Permanent Injunction have been found for sale in the marketplace, after the entry of judgment in this matter. Plaintiff has offered no evidence that defendants themselves have licensed or sold infringing products after the entry of the Permanent Injunction. The Court therefore construes this argument as relying on one or more of the following provisions of the Permanent Injunction:

a.   The provision barring defendants and "confederates and any other persons or entities acting in concert or participation with them" from offering for sale any infringing products. Doc. #70 at 2.

b.   The provision barring defendants from "enabling others to sell or pass off" infringing items as genuine products. Id. at 3.

c.   The provision barring defendants from "assisting, aiding, or abetting any other person or business entity" in violating any term of the Permanent Injunction. Id. at 4.

The Court will refer to conduct prohibited by these provisions of the Permanent Injunction as "Enabling Violations" for purposes of this ruling.

Second, plaintiff affirmatively asserts that defendants violated the Permanent Injunction by telling a licensee, Access Bags, which was in possession of infringing product, that Access

Bags could sell the infringing products, after the Permanent Injunction entered, barring any such sale. Such an action by defendants would violate any of the above provisions.

The Court will evaluate plaintiff's claim under each of these alternate theories. As a threshold matter, however, the Court must determine the standard of proof applicable to this claim. Neither party articulates the standard of proof that must be met by plaintiff in establishing that the Permanent Injunction has been violated for purposes of awarding liquidated damages.[5]

A consent judgment, such as the one entered in this case, has "a dual character, a 'hybrid nature' that reflects attributes of both a contract and a judicial decree." Kozlowski v. Coughlin, 871 F.2d 241, 245 (2d Cir. 1989) (quoting Local Number 93, Int'l Assoc. of Firefighters v. Cleveland, 478 U.S. 501, 519 (1986)). Although the Permanent Injunction at issue here has been ordered by the Court, it was agreed upon by the parties. As such, it "is a contract between the parties, and should be interpreted accordingly." Tourangeau v. Uniroyal, Inc., 101 F.3d 300, 307 (2d Cir. 1996); see also United States v. ITT Cont'l Baking Co., 420 U.S. 223, 238 ("[A] consent decree

---

[5] The parties correctly identify the standard applicable to plaintiff's motion for a finding of contempt. Such a finding would require proof by clear and convincing evidence. See King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995).

or order is to be construed for enforcement purposes basically as a contract[.]"); Whitmire v. Corbel & Co., 977 F. Supp. 290, 293 (S.D.N.Y. 1997) ("Consent judgments are agreements between parties to litigation and, therefore, should be construed as contracts.").

Under Connecticut law, a party asserting a breach of contract has the burden of proving that breach by a preponderance of the evidence.[6] See, e.g., Franco v. Yale Univ., 238 F. Supp. 2d 449, 453 (D. Conn. 2002), aff'd, 80 F. App'x 707 (2d Cir. 2003); see also Madigan v. Hous. Auth. of Town of E. Hartford, 113 A.3d 1018, 1029 n.2 (Conn. App. 2015) (affirming jury instruction stating that "the burden of proof is on the plaintiff to prove by a preponderance of the evidence that the defendant breached his contract of employment"); Chieffalo v. Norden Sys., Inc., 714 A.2d 1261, 1264 (Conn. App. 1998). Cf. E.E.O.C. v. New York Times Co., No. 92CV6548(RPP), 1998 WL 474201, at *14 (S.D.N.Y. Aug. 13, 1998) (finding violation of a consent decree by the preponderance of the evidence standard), aff'd in part, rev'd in part, 196 F.3d 72 (2d Cir. 1999).

Preponderance is not a terribly demanding standard. "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." Fischl

---

[6] The parties do not contest that Connecticut law applies.

v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). "The burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (internal citations and quotation marks omitted).

"Proof by a preponderance means that the petitioner must adduce evidence that makes the existence of a contested fact more likely than not. In other words, the petitioner's proof needs only tip the scale by the slightest evidentiary margins." Negron v. Mallon Chevrolet, Inc., No. 3:08CV182(TPS), 2011 WL 6034477, at *7 (D. Conn. Dec. 5, 2011) (citations and quotation marks omitted). "[A] fact has been proven by a preponderance of the evidence if it finds that the scales tip, however slightly, in favor of the party with the burden of proof as to that fact." Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 187 (2d Cir. 1992) (citations and quotation marks omitted).

### 1. Infringing Products in the Marketplace

Plaintiff has submitted exhibits, in connection with its briefing, that it asserts establish that infringing products, licensed or manufactured by defendants, continued to be

available in the marketplace after entry of the Permanent
Injunction. Many of these exhibits are "screen shots" of
internet sites offering infringing products for sale. <u>See</u>, <u>e.g.</u>,
Docs. #113-9 (Ex. 3); #113-11 (Ex. 5); #113-12 (Ex. 6); #113-13
(Ex. 7); #113-14 (Ex. 8); #113-15 (Ex. 9); #113-16 (Ex. 10).
Plaintiff has provided exhibits indicating that counsel for
plaintiff was able to purchase two potentially infringing items.
The first is an item described as "Macbeth Women's Meet Shorty
Short Willy Prep," a pair of shorts featuring the whale logo at
the heart of this action, purchased from an internet retailer on
April 6, 2017, well after entry of the Permanent Injunction. <u>See</u>
Doc. #113-13 (Ex. 7). The second is an item advertised as a
"Macbeth Collection Blue Whale Tote Bag" featuring another
version of the disputed whale logo, purchased from an internet
retailer on May 17, 2017, again, well after entry of the
Permanent Injunction.[7] <u>See</u> Doc. #113-14 (Ex. 8).

These exhibits were submitted by plaintiff's counsel, as
attachments to an affidavit of counsel. The affidavit states

---

[7] This product bears a tag indicating it was manufactured by
Access Bags, <u>see</u> Doc. #113-14 at 11 (Ex. 8), and thus will be
relevant to the discussion of the alleged violation of the
Permanent Injunction involving that company as well. In this
context, however, it is discussed solely as an allegedly
infringing product found on the market after entry of the
Permanent Injunction.

that the attachments are "[t]rue and accurate screenshots of webpages[.]" Doc. #113-6 at 2.

The exhibits do, indeed, support a finding that infringing products either made or licensed by defendants remained available in the marketplace after the entry of the Permanent Injunction. The mere availability of such products in the marketplace, however, does not establish that any defendant has actually engaged in conduct that violates the Permanent Injunction.

As noted above, to establish that the defendants have engaged in Enabling Violations of the Permanent Injunction, plaintiff must show that the persons offering infringing items for sale are "confederates" or "acting in concert or participation with" defendants; that defendants are "enabling others to sell" infringing items; or that defendants are "assisting, aiding, or abetting any other person or business entity" in violating the Permanent Injunction. Doc. #70 at 2-4. Plaintiff has not provided any evidence that could support a finding, by a preponderance, that any defendant engaged in any Enabling Violations of the Permanent Injunction. The mere availability of the infringing products on the internet is insufficient to meet plaintiff's burden.

One exhibit provided suggests the possibility of collusion between defendants and those offering infringing products.

Counsel for plaintiff provides an email that he sent to counsel for defendants on December 4, 2015, alleging that "contraband products originating from MacBeth Defendants" remain available on the internet, and asserting:

> As for your clients' "knowledge" or lack thereof, since making you aware of these violations certain of the offenders have once again removed all references of such goods from their websites. Thus and contrary to your clients' claims of ignorance, the fact that certain of the entities identified have now ceased sales on two (2) separate occasions following Vineyard Vines demands to the MacBeth Defendants is strong evidence of the MacBeth Defendants' participation in and ability to stop further illegal and illicit use of Vineyard Vines IP by the entities identified.

Doc. #113-9 at 26 (Ex. 3) (sic). While this email refers to "strong evidence," it in fact does not provide any admissible evidence. The affidavit to which this email is attached attests that the attachment is a true and correct copy of the email sent to counsel. See Doc. #113-6 at 1. However, the allegations set forth in that email are just that: allegations. Plaintiff's counsel infers from his observations of internet sites that defendants continue to be involved in the marketing of available products. However, no actual evidence of any such involvement is in fact presented.

Furthermore, the Court notes that to the extent plaintiff alleges that the defendants had the "ability to stop further" sales of infringing products, Doc. #113-9 at 26 (Ex. 3), the Permanent Injunction does not impose any affirmative duty on

defendants to do so. The Permanent Injunction does not include any provision requiring defendants to affirmatively attempt to stop any third party from engaging in infringing activity. Rather, the Permanent Injunction appropriately bars defendants from engaging in either direct or Enabling Violations. Plaintiff points to no provision of the Permanent Injunction that would require defendants to seek out third parties and attempt to stop them from selling items that might once have been licensed or produced by defendants.[8]

In sum, plaintiff has presented a great deal of material documenting its belief that infringing products remained on the marketplace well after entry of the Permanent Injunction. It has

---

[8] Plaintiff appears to conflate the Permanent Injunction – which is the subject of the Motion to Enforce – with an Order the Court entered in 2017, after, and distinct from, the Permanent Injunction itself. In that Order, the Court directed defendant Josephs to "make a diligent and concerted effort to stop third party vendors from importing, exporting, shipping, delivering, holding for sale, offering for sale, selling, distributing, returning, transferring and/or otherwise moving or disposing of in any manner any infringing products." Doc. #91 at 2. Defendant Josephs filed responses, including an Affidavit, demonstrating her compliance with that Order. See Docs. #101; #102; #103. To the extent plaintiff asserts violations of that Court Order, the remedy for any such violations would not be found in the provisions of the Permanent Injunction, as the Permanent Injunction itself does not include these directives to defendant Josephs. Rather, the remedy for violation of the Court Order would be a finding of contempt. As set forth elsewhere in this ruling, the standard for a finding of contempt is clear and convincing evidence. The Court does not find clear and convincing evidence that defendant Josephs – the only defendant to whom the Court Order was directed – has violated that Order.

not, however, produced evidence sufficient to establish that any defendant has actually violated any provision of the Permanent Injunction in relation to the ongoing presence of those products on the market. Accordingly, the Court finds that plaintiff has not met its burden of establishing a violation of the Permanent Injunction under this theory.

            2.   Access Bags

Plaintiff also asserts that defendants have violated the Permanent Injunction by specifically authorizing and/or directing a third party, Access Bags, to sell infringing products after entry of the Permanent Injunction. The Court finds that, under this theory, plaintiff has met its burden of proof, and has submitted evidence sufficient to establish that defendants violated the Permanent Injunction.

As noted above, plaintiff has provided records of a purchase of a case of 36 "Macbeth Collection Blue Whale Tote Bags" from an online retailer on May 17, 2017. See Doc. #113-14 (Ex. 8). These bags, which feature the "infringing whale" logo at issue in the underlying litigation, bear tags branding them as "MACBETH COLLECTION BY MARGARET JOSEPHS." See id. at 10. These tags also bear the name "Access Bag N' Pack" and the address and website for Access Bags. See id. at 11. Counsel for plaintiff has provided a sworn affidavit averring that these are "[t]rue and accurate electronic printouts of email receipts and

photographs evidencing the May 17, 2017 purchase of an
Infringing Product[.]" Doc. #113-6 at 2.

As to this purchase, plaintiff has produced evidence
demonstrating that defendants "enable[ed] others to sell or pass
off" the infringing item(s). Doc. #70 at 3. Specifically,
plaintiff has produced an affidavit of Kurt Simonides, the
"founder and President of Access Bag N' Pack, Inc., a New York
corporation founded in 1991 ('Access Bags')." Doc. #132-1 at 1.
Simonides avers that Access Bags entered into a License
Agreement with MacBeth Group, and provides a copy of that
Agreement. See Docs. #132-1 at 2; #132-3. Simonides attests that
among the items Access Bags was licensed to produce were the
"Whale Tote Bags" referred to in Doc. #113-14, described above.
Simonides asserts that after producing these bags, he received
an email from Josephs, with a copy to Ralph Nasar, stating that
the bags would not be purchased. "We will have to have an
unloading Plan without branding on it :( I am devastated for
both of us." Doc. #132-5 at 2.[9] Simonides knew Nasar to be "Vice

---

[9] When these events allegedly occurred, a preliminary injunction
was in place. See Doc. #35. However, that preliminary injunction
by its own terms was to remain in effect only until "final
adjudication of this matter[.]" Id. at 4. Furthermore, a
permanent injunction replaces any preliminary injunction
previously entered. See F.T.C. v. Verity Int'l, Ltd., 443 F.3d
48, 56 (2d Cir. 2006). Thus, the Court considers these events as
context for the claim that the Permanent Injunction now in
effect was violated, not as independent violations.

President of 'The MacBeth Group, Inc.'" and it was Nasar who introduced Simonides to Josephs for the first time, in 2012. Doc. #132-1 at 1.

On November 18, 2014, Simonides received another email, this time from Nasar with Josephs copied, stating: "The whale bag from the style attached we need taken off online sites right away, we are having a legal issue for the whale and are waiting on a resolution." Doc. #132-6 at 1. Simonides asserts that Nasar gave him "further oral instructions to 'hold off' on selling any more whale product," and that Access Bags therefore removed the Whale Tote Bags from the items to be shipped out for sale. Doc. #132-1 at 2.

Simonides then attests as follows:

> Throughout early 2015, I then had several conversations with Ralph Nasar about the status of the Whale Trademark dispute as Access Bags continued to "sit on" its significant inventory of Whale Tote Bags. Specifically, Ralph Nasar repeatedly told me to continue to hold on to the Whale Tote Bags as the Whale Trademark dispute was being resolved, although it was a "state by state" process that would take time.

Id. at 3. On April 30, 2015, Simonides attests, he "noticed online that defendants were again using a whale image similar to the Whale Trademark, only with a water spout added to the whale icon design." Id. He sent a text message to Nasar at that time, inquiring whether putting "the water spout above the whale to get around [the] lawsuit[]" would "work". Doc. #132-8. Nasar

responded: "That should get us around lawsuit. As it's a different whale. We did pull all whales off website for the time being though." Id. In light of this communication, and a continuing "pattern of reassurance[,]" Simonides continued to "sit on the Whale Tote Bags" rather than selling them. Doc. #132-1 at 3.

On May 20, 2015, Nasar emailed Simonides stating that "the issue with the whale bag which the case will end this week and we will have an answer on." Doc. #132-10 at 2. Again, Simonides held the Whale Tote Bags off the market in reliance on this representation. See Doc. #132-1 at 3. Simonides avers:

> In late 2015, Ralph Nasar informed me on a telephone call that the Whale Trademark dispute with Vineyard Vines was resolved, and as such Access Bags could now sell off the remaining Whale Tote Bags inventory. Based on these assurances, Access Bags put the Whale Tote Bags back into the marketplace in early 2016.

Doc. #132-1 at 3.

Defendants have submitted an affidavit of Josephs contradicting some of the statements made by Simonides. See Doc. #120-1. Specifically, Josephs attests that "MacBeth also contacted Access Bag N' Pack who marketed totes with a whale icon. They were instructed to destroy all such items." Doc. #120-1 at 4. In support of this assertion, Josephs points to an email from Nasar to defendants' counsel (with a copy to Josephs)

dated April 21, 2015. <u>See</u> Doc. #120-3 at 25 (Ex. G).[10] That email
states that MacBeth has "to end the contract with[]" Access
Bags, as MacBeth has "signed another Licensee to take over this
category and we have had issues on both ends since the
beginning." <u>Id.</u> The email continues:

> We just had a call with them and instead of arguing and
> fighting we all decided its better to just walk away as
> friends.
> This company also has some backpacks with whale icon on
> it that we told them they have to destroy because of
> vineyard vines issue. They have agreed.
> We need a basic letter drawn up for both parties to sign.
> In that agreement it should say that they can not and
> will not sell in anyway the bag with whale icon.
> They can no longer produce any other Macbeth product and
> they have a 1 year sell off period on current inventory.
> Both parties will walk away from this deal and nobody
> will owe money to either party.

<u>Id.</u> (sic)[11]

The "basic letter" agreement contemplated by this email has
not been produced by defendants. No other evidence supporting
the claims made in this email is provided by defendants. Defense
counsel's affidavit does not address the substance of this
email, rather, it simply avers that the copy attached is true
and correct. <u>See</u> Doc. #120-2 at 2.

---

[10] The Josephs Affidavit refers to Exhibit F, but this appears to
be a typographical error, as the only exhibit that purports to
support her claims as to Access Bags is Exhibit G.

[11] Simonides asserts in his affidavit that the representations in
this email are untrue, and that he never "had a conversation
about destroying 'whale icon' products." Doc. #132-1 at 3.

It is noteworthy that the email described above is provided together with a series of other exhibits relating to other third party licensees or vendors of defendants' products. The other exhibits generally consist of emails sent by defendants directly to the third parties, directing them not to sell infringing products. See generally, Doc. #120-3. As to Access Bags, however, no direct evidence of contact is offered. Indeed, defendants have not even offered an affidavit of Nasar to attest to the truthfulness and accuracy of the email to counsel. Josephs' own affidavit referencing the email makes no reference to any phone call with representatives of Access Bags, or to any letter agreement terminating MacBeth's relationship with Access Bags. The Affidavit further makes no claim that Josephs had personal knowledge of, or direct involvement in, any instruction to Access Bags to destroy any Infringing Products. Rather, Josephs' affidavit states simply that "MacBeth" contacted Access Bags, without specifying who acted on behalf of MacBeth, and how any such contact occurred. See Doc. #120-1 at 4.

Defendants have thus failed to proffer any competent evidence that contradicts Simonides' claims regarding his communications with Nasar and Josephs. Furthermore, the evidence that has been proffered supports an inference that no phone call occurred on or about April 21, 2015, in which Access Bags was instructed to destroy all Whale Tote Bags. In particular, if

such a call in fact occurred on April 21, 2015, the text messages between Nasar and Simonides on April 30, 2015, in which Simonides expressly refers to the totes and Nasar indicates that whale products have been removed from the website "for the time being," Doc. #132-8 at 2, would make no sense. Likewise, there is no reason that Nasar would have emailed Simonides on May 20, 2015, assuring him that issues relating to the "whale bag" would be resolved shortly, if Nasar had already instructed Simonides to destroy the bags. <u>See</u> Doc. #132-10.[12] Furthermore, defendants have provided an email from counsel for defendants to counsel for Access Bags, dated February 16, 2017, directing Access Bags "to refrain from further sale or distribution of the whale bags." Doc. #120-3 at 31. This email, which was forwarded to Josephs immediately after sending, does not make any reference to any prior direction by defendants to Access Bags to stop selling or distributing any products. <u>See id.</u>

Nasar was acting on behalf of defendants in his dealings with Simonides and Access Bags. Defendants do not dispute this. Indeed, Josephs' representation in her affidavit that "MacBeth" contacted Access Bags, based on and incorporating Nasar's email

---

[12] The Court notes that defendants have not contested the authenticity of either the text message or the email proffered by plaintiff.

claiming that he contacted Access Bags, confirms that Nasar was acting on behalf of defendants.

The evidence proffered establishes, by a preponderance, that defendants and their agents "enabl[ed] others" -- specifically, Access Bags -- "to sell or pass off" infringing items, Doc. #70 at 3, by informing Access Bags that the bags could be sold, after entry of the Permanent Injunction, as genuine products. The evidence further establishes, by a preponderance, that defendants "assist[ed], aid[ed] or abet[ed]" Access Bags in violating the Permanent Injunction, Doc. #70 at 4, by informing Access Bags that infringing products could be sold, after entry of the Permanent Injunction.

Accordingly, the Court finds by a preponderance of the evidence that defendants violated the Permanent Injunction.

### E.    Enforceability of Liquidated Damages Clause

Plaintiff seeks an award of $500,000 pursuant to the liquidated damages clause of the Final Judgment. See Doc. #113 at 1. The Final Judgment states: "[I]n the event Defendants violate this Injunction, breach the Settlement Agreement, or fail to timely pay an installment payment, Vineyard Vines shall be entitled to ... liquidated damages in the amount of Five Hundred Thousand Dollars ($500,000.00)[.]" Doc. #70 at 6. Plaintiff argues the Court should require payment of liquidated damages because "Defendants failed on multiple occasions to

fulfill most of the duties and obligations to which they agreed in the Settlement Agreement[,]" the clause was "bargained for and determined to be a reasonably just amount that Defendants agreed to be bound by[,]" and the amount is "neither disproportionate nor overly penal[.]" Doc. #113-2 at 17-19. Specifically, plaintiff asserts that the liquidated damages clause should be triggered by (a) defendants' failure to pay the full Judgment Amount and/or (b) defendants' violation of the Permanent Injunction. See generally id.[13]

### 1. Failure to Pay the Full Judgment Amount as a Basis for Award of Liquidated Damages

Defendants assert that their failure to pay the full Judgment Amount should not entitle plaintiff to liquidated damages. Defendants argue that enforcing the clause based solely on the failure to make complete and timely payment would constitute an unenforceable penalty upon defendants. See Doc. #120 at 21-22.

Plaintiff has met its burden of establishing that defendants "fail[ed] to timely pay an installment payment," which is sufficient to trigger the liquidated damages clause,

---

[13] Plaintiff's prior motion to enforce (Doc. #70) limited its assertions regarding the liquidated damages clause to a claim that the failure to pay the Judgment Amount should trigger the liquidated damages clause. The instant motion alleges that, in addition, violations of the Permanent Injunction have occurred that are sufficient to trigger the liquidated damages clause. See Doc. #113-2 at 17-19.

under the plain language of the Settlement Agreement. Doc. #70 at 6. "Under Connecticut law, a judgment entered in accordance with a stipulation of the parties is to be regarded and construed as a contract." Lee v. BSB Greenwich Mortg. Ltd. P'ship, 267 F.3d 172, 178 (2d Cir. 2001) (quotation marks and citations omitted).[14] A party asserting a breach of contract bears the burden of proving that breach by a preponderance of the evidence. See, e.g., Elec. Contractors, Inc. v. Pike Co., No. 3:11CV01449(JAM), 2015 WL 3453348, at *13 (D. Conn. May 29, 2015); Madigan, 113 A.3d at 1030. Plaintiff has met this burden as to defendants' failure to make timely payments of the Judgment Amount.

However, enforcement of a liquidated damages clause is not automatic. In Connecticut, there is a "clearly established public policy against the enforcement of penalty clauses in contracts." HH E. Parcel, LLC v. Handy & Harman, Inc., 947 A.2d 916, 926 (Conn. 2008). A liquidated damages clause is enforceable

> if three conditions are satisfied: (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the

---

[14] As previously noted, the parties do not dispute that Connecticut law applies.

presumable loss which would be sustained by the contractee in the event of a breach of the contract.

Id. at 927 (citations and quotation marks omitted). "A breaching party seeking to nullify a contract clause that fixes an amount as damages for the breach bears the burden of proving that the agreed upon amount so far exceeds any actual damages as to be in the nature of a penalty." Am. Car Rental, Inc. v. Comm'r of Consumer Prot., 869 A.2d 1198, 1210 (Conn. 2005).

As to defendants' failure to pay the full Judgment Amount, enforcement of the liquidated damages clause would not be appropriate. The amount unpaid is $110,000 – barely one-fifth of the liquidated damages sought. The damage that could result from failure to pay was known in advance; it is, simply, the failure to receive a set amount of funds. Enforcement of the liquidated damages clause in this context would be purely punitive. Accordingly, the Court declines to award liquidated damages based on defendants' failure to pay the full Judgment Amount. Cf. Bill v. Cusano, No. CV-06-5005899-S, 2009 WL 1959473, at *3 (Conn. Super. Ct. June 8, 2009) ("The damages that the plaintiff suffered as a result of the defendants' breach of the contract, if any, were so substantially less than the $50,000 provided for in the liquidated damages clause that to enforce the clause would be tantamount to imposing an unfair and unreasonable penalty."); Zalonski v. McMahon, 220 A.2d 35, 37 (Conn. Cir. Ct.

1966) (finding liquidated damages clause unenforceable where the "damage as the result of a breach could quite easily be ascertained, and it would not be difficult to prove damage").

> 2.   Violation of the Permanent Injunction as a Basis for Award of Liquidated Damages

The liquidated damages analysis is different as to the allegation that defendants violated the Permanent Injunction. As to the Permanent Injunction, the requirements for enforcement of a liquidated damages clause are met. The damage to be expected from a breach of the Permanent Injunction would be "uncertain in amount or difficult to prove;" the parties manifested an intent "to liquidate damages in advance;" and the $500,000 amount agreed upon is not "greatly disproportionate to the amount of the damage which" might be expected from such a breach. HH E. Parcel, LLC, 947 A.2d at 927 (citations and quotation marks omitted).

Plaintiff asserts that these requirements are met as to any violation of the Permanent Injunction, and defendants do not seriously dispute the assertion. Notably, defendants offer no evidence suggesting that the liquidated damages amount exceeds plaintiff's actual damages, let alone that the liquidated damages amount is "greatly disproportionate" to any such damages. Accordingly, if plaintiff has established that defendants have, in fact, violated the Permanent Injunction,

then enforcement of the liquidated damages provision would be appropriate on that basis. The Court has determined that plaintiff has established, by a preponderance of the evidence, that defendants have violated the Permanent Injunction. Accordingly, an award of liquidated damages is appropriate, and plaintiff's request for an award of liquidated damages is **GRANTED**. The Court orders defendants to pay plaintiff the amount of $500,000, pursuant to the stipulated Final Judgment.

### F.    Statutory Damages

Plaintiff next asks the Court to award it $8,600,000 in asserted statutory damages for infringement of registered trademarks pursuant to 15 U.S.C. §1117(c) and registered copyrights pursuant to 17 U.S.C. §504(c). See Doc. #113-2 at 10. Plaintiff argues that an award of statutory damages is warranted because defendants continue to willfully infringe on plaintiff's registered trademarks and copyrights. See id. at 15. Defendants respond in a cursory fashion that plaintiff is "not entitled to ... statutory damages[.]" Doc. #120 at 22.

The Court concludes that statutory damages are not available to plaintiff in these circumstances. In this case, plaintiff elected to resolve its claims against defendants by way of a settlement and Stipulated Final Judgment. The relief for any violation of that Judgment, and the Permanent Injunction it encompasses, is not rescission of the agreement or

invalidation of the Judgment. It is, instead, the remedies set forth in the Settlement Agreement and Final Judgment.[15]

"It is well settled that a seller may not retain a stipulated sum as liquidated damages and also recover actual damages." Hanson Dev. Co. v. E. Great Plains Shopping Ctr., Inc., 485 A.2d 1296, 1299 (Conn. 1985); see also Dean v. Connecticut Tobacco Corp., 92 A. 408, 411 (Conn. 1914) ("The parties having stipulated in advance as to the amount of damages recoverable, further recovery, or recovery upon some other basis, could not, of course, be had.").

The Court has found that an award of liquidated damages is appropriate here. Accordingly, actual damages are not available. "Both actual damages and liquidated damages cannot be awarded." Sanitary Servs. Corp. v. Greenfield Vill. Ass'n, Inc., 651 A.2d 269, 271 (Conn. App. Ct. 1994); see also Camp v. Cohn, 201 A.2d 187, 189 (Conn. 1964) (Where parties agree upon a liquidated damages provision, "the stipulated sum could be recovered, but no other sum could be recovered as actual damages.").

Furthermore, plaintiff has not proven that it has suffered actual damages sufficient to trigger an award of statutory damages. Rather, plaintiff has proven, by a preponderance of the

---

[15] The Court offers no opinion on whether plaintiff might have the right to file a further civil action against defendants for any alleged additional conduct occurring after the Judgment was entered, for which remedy is not sought in this action.

evidence, that defendants have violated the Permanent Injunction, and that its damages as a result of that violation are unknown, and the Court has therefore awarded liquidated damages. Accordingly, plaintiff's request that the Court award $8,600,000 in statutory damages is **DENIED**.

### G.   Contempt

Plaintiff asserts: "Because Defendants have failed to comply with any of the Court's Orders, most notably the Final Judgment, and have blatantly disregarded the law, Vineyard Vines is entitled to a finding of civil contempt against Defendants in this action." Doc. #113-2 at 9. Plaintiff does not articulate a particular rule or statute[16] under which it seeks a finding of contempt, but instead appears to rely upon the Court's "inherent authority to enforce compliance" with its orders. Id. at 7. Plaintiff moves the Court for "an Order imposing coercive sanctions on Defendants[.]" Doc. #113 at 2. However, plaintiff

---

[16] Plaintiff does not, for instance, rely upon Rule 37(b)(2)(A)(vii) (allowing a court to "treat[] as contempt of court the failure to obey any [discovery] order") or Rule 16(f) (authorizing the application of 37(b)(2)(A)(vii) where a party fails to obey a pretrial order). Plaintiff also does not appear to rely on Rule 70(e), which provides that a party may be held in contempt if it fails to comply with a judgment requiring that party "to perform any ... specific act[.]" Fed. R. Civ. P. 70(e).

does not elaborate on this request, and does not explain what
imposition of a "coercive sanction" would achieve in this case.[17]

"[C]ourts have inherent power to enforce compliance with
their lawful orders through civil contempt." Shillitani v.
United States, 384 U.S. 364, 370 (1966). In enforcing the terms
of a Judgment, a court may use any enforcement tool at its
disposal, including civil contempt, and is not limited to "the
remedial contractual terms agreed upon by the parties because a
consent judgment contemplates judicial interests apart from
those of the litigants." United States v. N.Y.C. Dist. Council
of N.Y.C., 229 F. App'x 14, 17-18 (2d Cir. 2007) (quotation
marks and citations omitted).

The standard for contempt is strict, and "the power of a
district court to impose contempt liability is carefully
limited[.]" CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 98
(2d Cir. 2016) (citation and quotation marks omitted). "A
contempt order is warranted only where the moving party
establishes by clear and convincing evidence that the alleged
contemnor violated the district court's edict[]" by showing
"that (1) the order the contemnor failed to comply with is clear
and unambiguous, (2) the proof of noncompliance is clear and

---

[17] Indeed, it is not clear what additional relief plaintiff would
seek in connection with any finding of contempt, nor what
additional relief would be of benefit to plaintiff.

convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." King, 65 F.3d at 1058. "[T]he moving party ... bears the burden of establishing [these] three factors[.]" Latino Officers Ass'n City of New York, Inc. v. City of New York, 558 F.3d 159, 164 (2d Cir. 2009). "[A] contempt order is a potent weapon that is inappropriate if there is a fair ground of doubt as to the wrongfulness of the defendant's conduct[.]" Id. (quotation marks and citations omitted).

The Court has found, as set forth above, that plaintiff has established by a preponderance of the evidence that defendants have violated the Permanent Injunction. The Court does not find, however, that the evidence proffered rises to the level of clear and convincing. The Court's finding regarding the violation of the Permanent Injunction is limited to defendants' contacts with a single third party licensee. The evidence proffered is limited, and contested (although weakly) in part. Plaintiff has met its burden by a preponderance, but not by clear and convincing evidence.

To the extent plaintiff seeks a finding of contempt based on defendants' failure to pay the full amount of the money judgment, the Court declines to hold defendants in contempt on this basis. Indeed, it is inappropriate to use the Court's contempt power to enforce a money judgment. See Ecopetrol S.A. v. Offshore Expl. & Prod. LLC, 172 F. Supp. 3d 691, 698

(S.D.N.Y. 2016) ("[C]ontempt power should not be used to enforce a money judgment[.]"); <u>Nykcool A.B. v. Pac. Fruit Inc.</u>, No. 10CV3867(LAK)(AJP), 2012 WL 1255019, at *8 (S.D.N.Y. Apr. 16, 2012) ("While a court may hold a disobedient party in contempt to enforce a judgment for a specific act pursuant to Rule 70, Rule 70's equitable remedies are not appropriate to enforce a money judgment."); <u>Shuffler v. Heritage Bank</u>, 720 F.2d 1141, 1147 (9th Cir. 1983) ("The proper means for [a party] to secure compliance with a money judgment is to seek a writ of execution, not to obtain a fine of contempt for the period of non-payment.").

Furthermore, the Court declines, as a matter of discretion, to hold defendants in contempt. "The judicial contempt power is a potent weapon." <u>Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n</u>, 389 U.S. 64, 76 (1967). As the Second Circuit has cautioned, "the court must not lightly invoke its contempt power." <u>In re Attorney Gen. of U.S.</u>, 596 F.2d 58, 65 (2d Cir. 1979). This is true because the "exercise of the contempt power is awesome in its implications." <u>United States v. Wendy</u>, 575 F.2d 1025, 1030 (2d Cir. 1978). Here, the Court finds that the circumstances do not support a finding of contempt.

Accordingly, plaintiff's motion for a finding of contempt is **DENIED**.

## H.   Costs and Attorneys' Fees

Finally, plaintiff asks the Court to award it "$201,657.21 in Vineyard Vines' actual expenses, including reasonable attorneys' fees, associated with the enforcement of the Consent Judgment." Doc. #113 at 1. Plaintiff argues that defendants' "willful failures to abide by Court order and the parties' agreement ha[ve] forced Vineyard Vines to reengage in expensive, taxing and unnecessary litigation for which it must be compensated under the so-ordered provisions of the Final Judgment." Doc. #113-2 at 20. Defendants do not expressly contest that plaintiff is entitled to attorneys' fees, but they characterize the amount of fees requested as "astronomical[.]" Doc. #120 at 3.

The Final Judgment provides that "in the event Defendants violate this Injunction, breach the Settlement Agreement, or fail to timely pay an installment payment, Vineyard Vines shall be entitled to ... recovery of its actual expenses, including reasonable attorneys' fees, associated with the enforcement of the Settlement Agreement and this Injunction[.]" Doc. #70 at 6.

Defendants do not dispute that they have they have failed to pay the full Judgment Amount in accordance with the Payment Schedule set forth in the Final Judgment. See Docs. #129 at 6; #120 at 7. The Court has found that defendants violated the Permanent Injunction. Therefore, plaintiff is entitled to

recover its actual expenses, including reasonable attorneys' fees.

"A district court has considerable discretion in determining a reasonable attorneys' fee amount, and its assignment of a lodestar figure will result in a presumptively reasonable fee." Midamines SPRL Ltd. v. KBC Bank N.V., No. 161048, 2017 WL 6029541, at *1 (2d Cir. Dec. 6, 2017) (quotation marks and citation omitted).

> To evaluate a request for attorneys' fees, courts must conduct a lodestar analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate. If at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures, then the number of hours proffered is reasonable. As to the hourly rate, a district court has discretion but should begin generally with the prevailing market rates in the relevant community.

CSL Silicones, Inc. v. Midsun Grp. Inc., No. 3:14CV01897(CSH), 2017 WL 1399630, at *2 (D. Conn. Apr. 18, 2017). The party seeking an award of fees must provide "contemporaneous time records. These records should specify, for each attorney, the date, the hours expended, and the nature of the work done." New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).

Here, plaintiff has not submitted sufficient information to enable the Court to determine a reasonable attorneys' fee amount. The time records submitted by plaintiff are redacted,

and they do not indicate the nature of the work done. <u>See</u> Docs. #113-4; #113-5.[18] Many of the time records also fail to indicate which attorney or other person expended the hours indicated. <u>See id.</u> The "expenses" are listed only by amount, with no indication of why they were incurred, or for what. <u>See id.</u> Furthermore, no information has been provided regarding the reasonableness of the hourly rates sought.

Therefore, plaintiff's request for an award of actual expenses, including reasonable attorneys' fees, associated with the enforcement of the Final Judgment is **GRANTED, contingent upon the provision of additional information**. The Court will determine what amount of attorneys' fees and costs should be awarded after reviewing plaintiff's unredacted billing statements. Plaintiff shall file a supplemental memorandum in support of the request for an award of fees and costs, on or before **January 11, 2019**. Plaintiff shall file, together with this memorandum, under seal, detailed, contemporaneous time records that specify, for each attorney, the date, the hours expended, and the nature of the work done.

---

[18] The Court notes that any award of fees and costs may be limited to those aspects of plaintiff's motion that were granted, and thus knowing the nature of work performed is particularly significant.

III. __CONCLUSION__

Accordingly, for the reasons set forth above, the Court **GRANTS, in part, and DENIES, in part**, plaintiff's Motion for Additional Relief **[Doc. #113]**:

- Plaintiff's motion for an order of civil contempt is **DENIED**;

- Plaintiff's motion for an award of $110,000, representing the unpaid portion of the Judgment Amount is **GRANTED**;

- Plaintiff's motion for an award of $20,000 in Additional Debt is **DENIED**;

- Plaintiff's motion for an award of $500,000 in liquidated damages is **GRANTED**;

- Plaintiff's motion for $8,600,000 in statutory damages is **DENIED**; and

- Plaintiff's motion for actual expenses, including reasonable attorneys' fees, associated with the enforcement of the Final Judgment is provisionally **GRANTED, in whole or in part, contingent upon the provision of additional information.** Plaintiff shall file a supplemental memorandum **on or before January 11, 2019.**

A separate judgment will enter against defendants MacBeth Collection, L.L.C., MacBeth Collection By Margaret Josephs, LLC,

and Margaret Josephs, jointly and severally, in the following amounts:

- $110,000 of the unpaid Judgment Amount;

- $500,000 in liquidated damages; and

- An amount of actual expenses, including reasonable attorneys' fees, to be determined in a subsequent order.

The Court further orders Defendants to immediately cease and desist from any and all violations of the Permanent Injunction and Final Judgment on Consent (Doc. #70).

SO ORDERED at New Haven, Connecticut, this 5th day of December, 2018.

_____
/s/
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE